**UNITED STATES DISTRICT COURT**

**CENTRAL DISTRICT OF CALIFORNIA**

MARK ANTHONY PRUITT,                )  Case No. EDCV 16-2416-JPR
                                    )
                 Plaintiff,         )
                                    )  **MEMORANDUM DECISION AND ORDER**
         v.                         )  **AFFIRMING COMMISSIONER**
                                    )
NANCY A. BERRYHILL, Acting          )
Commissioner of Social              )
Security,[1]                        )
                                    )
                 Defendant.         )
_____     )

**I.    PROCEEDINGS**

     Plaintiff seeks review of the Commissioner's final decision denying his application for supplemental security income benefits ("SSI").  The parties consented to the jurisdiction of the undersigned U.S. Magistrate Judge under 28 U.S.C. § 636(c).  The matter is before the Court on the parties' Joint Stipulation, filed July 5, 2017, which the Court has taken under submission without oral argument.  For the reasons stated below, the Commissioner's decision is affirmed.

_____

     [1] Nancy A. Berryhill is substituted in as the correct Defendant.

1

## II.  BACKGROUND

Plaintiff was born in 1957.  (Administrative Record ("AR") 43, 247.)  He has a ninth-grade education (AR 43) and last worked as a laborer in 2004 (AR 297).

On November 13, 2012, Plaintiff applied for SSI, alleging that he had been disabled since February 17, 2008 (AR 247), because of "paranoid schizophrenia, [chronic obstructive pulmonary disease], deafness, high cholesterol and auditory hallucinations" (see AR 165).[2]  After his application was denied initially and upon reconsideration (id.), he requested a hearing before an Administrative Law Judge (AR 172).  A hearing was held on February 10, 2015, at which Plaintiff, who was represented by a nonattorney from a law firm (AR 211), testified, as did a vocational expert.  (See AR 39-64.)  A supplemental hearing was held on June 2, 2015, primarily regarding the VE's testimony. (AR 65-101.)  In a written decision issued July 2, 2015, the ALJ found Plaintiff not disabled.  (AR 20-38.)  Plaintiff requested review and submitted additional medical evidence.  (See AR 18, 566-83.)  On September 23, 2016, the Appeals Council denied review, finding that the additional evidence did not provide a basis for changing the ALJ's decision.  (AR 1-4.)  The council

_____

[2] Plaintiff previously applied for SSI on March 24, 2006. (See AR 23.)  The application was denied, and the decision was affirmed by an ALJ on May 19, 2008.  (Id.)  Though the case was remanded by the district court, the denial was again affirmed on November 19, 2010, and Plaintiff did not appeal.  (Id.)  The ALJ here found that Plaintiff had demonstrated changed circumstances since that final decision, however (AR 24), in the form of physical impairments, and thus the Chavez presumption does not apply.  See Lester v. Chater, 81 F.3d 821, 827-28 (9th Cir. 1995) (as amended Apr. 9, 1996) (citing Chavez v. Bowen, 844 F.2d 691, 693 (9th Cir. 1988)).  Defendant does not contend otherwise.

ordered that the new evidence be made part of the administrative record. (AR 5.) This action followed.

**III. STANDARD OF REVIEW**

Under 42 U.S.C. § 405(g), a district court may review the Commissioner's decision to deny benefits. The ALJ's findings and decision should be upheld if they are free of legal error and supported by substantial evidence based on the record as a whole. See id.; Richardson v. Perales, 402 U.S. 389, 401 (1971); Parra v. Astrue, 481 F.3d 742, 746 (9th Cir. 2007). Substantial evidence means such evidence as a reasonable person might accept as adequate to support a conclusion. Richardson, 402 U.S. at 401; Lingenfelter v. Astrue, 504 F.3d 1028, 1035 (9th Cir. 2007). It is more than a scintilla but less than a preponderance. Lingenfelter, 504 F.3d at 1035 (citing Robbins v. Soc. Sec. Admin., 466 F.3d 880, 882 (9th Cir. 2006)). To determine whether substantial evidence supports a finding, the reviewing court "must review the administrative record as a whole, weighing both the evidence that supports and the evidence that detracts from the Commissioner's conclusion." Reddick v. Chater, 157 F.3d 715, 720 (9th Cir. 1998). "If the evidence can reasonably support either affirming or reversing," the reviewing court "may not substitute its judgment" for the Commissioner's. Id. at 720-21.

**IV. THE EVALUATION OF DISABILITY**

People are "disabled" for purposes of receiving Social Security benefits if they are unable to engage in any substantial gainful activity owing to a physical or mental impairment that is expected to result in death or has lasted, or is expected to last, for a continuous period of at least 12 months. 42 U.S.C.

3

§ 423(d)(1)(A); <u>Drouin v. Sullivan</u>, 966 F.2d 1255, 1257 (9th Cir. 1992).

A.   <u>The Five-Step Evaluation Process</u>

The ALJ follows a five-step sequential evaluation process to assess whether a claimant is disabled.  20 C.F.R. § 416.920(a)(4); <u>Lester v. Chater</u>, 81 F.3d 821, 828 n.5 (9th Cir. 1995) (as amended Apr. 9, 1996).  In the first step, the Commissioner must determine whether the claimant is currently engaged in substantial gainful activity; if so, the claimant is not disabled and the claim must be denied.  § 416.920(a)(4)(i).

If the claimant is not engaged in substantial gainful activity, the second step requires the Commissioner to determine whether the claimant has a "severe" impairment or combination of impairments significantly limiting his ability to do basic work activities; if not, the claimant is not disabled and his claim must be denied.  § 416.920(a)(4)(ii).

If the claimant has a "severe" impairment or combination of impairments, the third step requires the Commissioner to determine whether the impairment or combination of impairments meets or equals an impairment in the Listing of Impairments set forth at 20 C.F.R. part 404, subpart P, appendix 1; if so, disability is conclusively presumed.  § 416.920(a)(4)(iii).

If the claimant's impairment or combination of impairments does not meet or equal an impairment in the Listing, the fourth step requires the Commissioner to determine whether the claimant

4

has sufficient residual functional capacity ("RFC")[3] to perform his past work; if so, he is not disabled and the claim must be denied. § 416.920(a)(4)(iv). The claimant has the burden of proving he is unable to perform past relevant work. Drouin, 966 F.2d at 1257. If the claimant meets that burden, a prima facie case of disability is established. Id.

If that happens or if the claimant has no past relevant work, the Commissioner then bears the burden of establishing that the claimant is not disabled because he can perform other substantial gainful work available in the national economy. § 416.920(a)(4)(v); Drouin, 966 F.2d at 1257. That determination comprises the fifth and final step in the sequential analysis. § 416.920(a)(4)(v); Lester, 81 F.3d at 828 n.5; Drouin, 966 F.2d at 1257.

B. The ALJ's Application of the Five-Step Process

At step one, the ALJ found that Plaintiff had not engaged in substantial gainful activity since the application date.[4] (AR

_____

[3] RFC is what a claimant can do despite existing exertional and nonexertional limitations. § 416.945; see Cooper v. Sullivan, 880 F.2d 1152, 1155 n.5 (9th Cir. 1989). The Commissioner assesses the claimant's RFC between steps three and four. Laborin v. Berryhill, 867 F.3d 1151, 1153 (9th Cir. 2017) (citing § 416.920(a)(4)).

[4] The ALJ incorrectly noted Plaintiff's application date as October 31, 2012, instead of November 13. (Compare AR 26, with AR 247.) But the mistake was harmless. See Stout v. Comm'r, Soc. Sec. Admin., 454 F.3d 1050, 1055 (9th Cir. 2006) (ALJ's error "harmless" when "the mistake was nonprejudicial to the claimant or irrelevant to the ALJ's ultimate disability conclusion"). Because "SSI can only be paid beginning the month after an application is filed," the relevant period begins on the application date and runs until the date of the ALJ's decision. See Rounds v. Comm'r Soc. Sec. Admin., 807 F.3d 996, 1000-01 & n.1 (9th Cir. 2015) (as amended) (citing § 416.335).

26.) At step two, she concluded that he had the following severe impairments: "schizophrenia; bipolar disorder; borderline intellectual functioning; a history of polysubstance abuse, including cocaine and alcohol; severe mixed hearing loss on the left and severe mixed hearing loss on the right; and a respiratory disorder." (AR 26.) At step three, she found that he did not have an impairment or combination of impairments falling under a Listing. (Id.)

At step four, the ALJ found that Plaintiff had the RFC to perform "a full range of work at all exertional levels," subject to the following nonexertional limitations:

> nonpublic; noncomplex routine tasks; can work in proximity to others but no tasks that require teamwork[;] cannot perform detailed tasks[;] cannot perform work where he would be responsible for the health and safety of others or require hypervigilance; should have verbal instructions rather than written instructions; should work in a quiet environment; cannot be required to communicate with others unless he can look directly at them with minimal to no background noise; should not be exposed to concentrated respiratory irritants.[5]

---

[5] The ALJ's RFC partially tracks the RFC determined by the previous ALJ on November 19, 2010:

> [C]laimant has the [RFC] to perform a full range of work at all exertional levels but with the following nonexertional limitations: the claimant is capable of performing simple repetitive tasks with no intense contact with the public, co-workers, or supervisors. He cannot perform detailed tasks; he cannot perform work where he would be responsible for the health and safety of others, and he should have verbal instructions rather

(AR 28.)  Based on the VE's testimony, the ALJ concluded that Plaintiff could not perform any past relevant work.  (AR 31.)  At step five, however, given his "age, education, work experience, and [RFC]," she determined that he could successfully find work in the national economy.  (<u>Id.</u>)  Thus, the ALJ found Plaintiff not disabled.  (AR 32.)

**V.    DISCUSSION**

Plaintiff argues that the ALJ erred in (1) evaluating the medical-opinion evidence of record and determining his "mental functional capacity," (2) evaluating the credibility of his subjective symptom statements, and (3) relying on "flawed" VE testimony.  (J. Stip. at 3.)  For the reasons discussed below, the ALJ did not err.

A.    <u>The ALJ Properly Evaluated the Medical-Opinion Evidence and Determined Plaintiff's RFC</u>

Plaintiff argues that the ALJ erred in assessing the medical-opinion evidence provided by Dr. Jeffrey C. Moffat, Jr. (J. Stip. at 4), and did not give any explanation for her mental-RFC finding (<u>id.</u> at 12-13).

1.    <u>Applicable law</u>

A claimant's RFC is "the most [he] can still do" despite impairments and related symptoms that "may cause physical and mental limitations that affect what [he] can do in a work setting."  § 416.945(a)(1).  A district court must uphold an ALJ's RFC assessment when the ALJ has applied the proper legal

_____

than written instructions.

(AR 109.)

standard and substantial evidence in the record as a whole
supports the decision.  Bayliss v. Barnhart, 427 F.3d 1211, 1217
(9th Cir. 2005).  The ALJ must consider all the medical opinions
"together with the rest of the relevant evidence."  § 416.927(b);
see also § 416.945(a)(1) ("We will assess your residual
functional capacity based on all the relevant evidence in your
case record.").

Three types of physicians may offer opinions in Social
Security cases: those who directly treated the plaintiff, those
who examined but did not treat the plaintiff, and those who did
neither.  Lester, 81 F.3d at 830.  A treating physician's opinion
is generally entitled to more weight than an examining doctor's,
and an examining physician's opinion is generally entitled to
more weight than a nonexamining physician's.  Id.; see
§ 416.927(c)(1).[6]

This is so because treating physicians are employed to cure
and have a greater opportunity to know and observe the claimant.
Smolen v. Chater, 80 F.3d 1273, 1285 (9th Cir. 1996).  But "the

---

[6] Social Security regulations regarding the evaluation of
opinion evidence were amended effective March 27, 2017.  When, as
here, the ALJ's decision is the final decision of the
Commissioner, the reviewing court generally applies the law in
effect at the time of the ALJ's decision.  See Lowry v. Astrue,
474 F. App'x 801, 804 n.2 (2d Cir. 2012) (applying version of
regulation in effect at time of ALJ's decision despite subsequent
amendment); Garrett ex rel. Moore v. Barnhart, 366 F.3d 643, 647
(8th Cir. 2004) ("We apply the rules that were in effect at the
time the Commissioner's decision became final."); Spencer v.
Colvin, No. 3:15-CV-05925-DWC, 2016 WL 7046848, at *9 n.4 (W.D.
Wash. Dec. 1, 2016) ("42 U.S.C. § 405 does not contain any
express authorization from Congress allowing the Commissioner to
engage in retroactive rulemaking").  Accordingly, citations to 20
C.F.R. § 416.927 are to the version in effect from August 24,
2012, to March 26, 2017.

findings of a nontreating, nonexamining physician can amount to substantial evidence, so long as other evidence in the record supports those findings." Saelee v. Chater, 94 F.3d 520, 522 (9th Cir. 1996) (per curiam) (as amended).

The ALJ may disregard a treating physician's opinion regardless of whether it is contradicted. Magallanes v. Bowen, 881 F.2d 747, 751 (9th Cir. 1989). When a treating physician's opinion is not contradicted by other medical-opinion evidence, however, it may be rejected only for "clear and convincing" reasons. Id.; see Carmickle v. Comm'r, Soc. Sec. Admin., 533 F.3d 1155, 1164 (9th Cir. 2008) (citing Lester, 81 F.3d at 830-31). When it is contradicted, the ALJ must provide only "specific and legitimate reasons" for discounting it. Carmickle, 533 F.3d at 1164 (citing Lester, 81 F.3d at 830-31).

In determining an RFC, the ALJ should consider those limitations for which there is support in the record and need not take into account properly rejected evidence or subjective complaints. See Bayliss, 427 F.3d at 1217 (upholding ALJ's RFC determination because "the ALJ took into account those limitations for which there was record support that did not depend on [claimant]'s subjective complaints"); Batson v. Comm'r of Soc. Sec. Admin., 359 F.3d 1190, 1197 (9th Cir. 2004) (ALJ not required to incorporate into RFC those findings from physician opinions that were "permissibly discounted"). The ALJ considers findings by state-agency medical consultants and experts as opinion evidence. § 416.927(e). Medical-source opinions on ultimate issues reserved to the Commissioner, such as a claimant's RFC or the application of vocational factors, are not

medical opinions and have no special significance. § 416.927(d).

Furthermore, "[t]he ALJ need not accept the opinion of any physician . . . if that opinion is brief, conclusory, and inadequately supported by clinical findings." <u>Thomas v. Barnhart</u>, 278 F.3d 947, 957 (9th Cir. 2002); <u>accord</u> <u>Batson</u>, 359 F.3d at 1195. An ALJ need not recite "magic words" to reject a physician's opinion or a portion of it; the court may draw "specific and legitimate inferences" from the ALJ's opinion. <u>Magallanes</u>, 881 F.2d at 755. "[I]n interpreting the evidence and developing the record, the ALJ does not need to 'discuss every piece of evidence.'" <u>Howard ex rel. Wolff v. Barnhart</u>, 341 F.3d 1006, 1012 (9th Cir. 2003) (quoting <u>Black v. Apfel</u>, 143 F.3d 383, 386 (8th Cir. 1998)).

The Court must consider the ALJ's decision in the context of "the entire record as a whole," and if the "'evidence is susceptible to more than one rational interpretation,' the ALJ's decision should be upheld." <u>Ryan v. Comm'r of Soc. Sec.</u>, 528 F.3d 1194, 1198 (9th Cir. 2008) (citation omitted).

2. <u>Relevant background</u>

Between 2009 and 2012, Plaintiff was incarcerated and received psychiatric treatment for auditory hallucinations and paranoia (<u>see</u> AR 349-425), and he has apparently received treatment for mental-health issues since at least 2004 (<u>see</u> AR 433, 435). While incarcerated, Plaintiff was assigned global assessment of functioning ("GAF") scores ranging from 53 to 65.

(See, e.g., AR 360, 362, 364.)[7]  He was noted to be marginally

compliant with his prescribed medication regimen and

inconsistently stable.  (See, e.g., AR 350, 359, 365, 385.)  For

example, in 2010, Plaintiff reported "doing well" and said his

"[s]ymptoms [were] under control with medication." (AR 350; see

also AR 352.)  In 2011, he asked to discontinue his medications

because he didn't think he "need[ed] them anymore" (AR 359, 361)

and reported "no problems" when off medication  (AR 362-64).  His

hallucinations returned during periods of stress, such as when

his fiancé "lost custody of her daughter" (AR 365), but when he

started taking his medications again, he reported feeling better

and having no symptoms (AR 385, 387).  Similarly, in 2012, he

reported hallucinations when stressed by his "wife's likely

infidelity" and paranoia "thinking that other[s] are after him"

(AR 413 (May 2012), 415-16 (Apr. 2012)) but was otherwise

compliant with medication and reported no hallucinations and

decreased paranoia (AR 408 (Sept. 2012), 409-10 (Aug. 2012), 411

(July 2012), 412 (June 2012), 417-18 (Mar. 2012), 419-20 (Feb.

_____

[7] A GAF score of 61 to 70 indicates mild symptoms in one
area or difficulty in social, occupational, or school functioning
but the person is generally functioning well with some meaningful
interpersonal relationships.  See Diagnostic and Statistical
Manual of Mental Disorders 32 (revised 4th ed. 2000).  A score of
51 to 60 indicates moderate symptoms or moderate difficulty in
social, occupational, or school functioning.  Id.  The
Commissioner has declined to endorse GAF scores, Revised Medical
Criteria for Evaluating Mental Disorders and Traumatic Brain
Injury, 65 Fed. Reg. 50764-65 (Aug. 21, 2000) (codified at 20
C.F.R. pt. 404) (GAF score "does not have a direct correlation to
the severity requirements in our mental disorders listings"), and
the most recent edition of the DSM "dropped" the GAF scale,
citing its lack of conceptual clarity and questionable
psychological measurements in practice.  Diagnostic and
Statistical Manual of Mental Disorders 16 (5th ed. 2012).

2012)).  After his release, he was treated at Phoenix Community
Counseling, where he was seen by psychiatrists Romeo Villar and
Jeffrey C. Moffat, Jr., among others.  (See AR 508-83.)

Dr. Villar began seeing Plaintiff in January 2013.
(AR 516.)  Throughout 2013, he monitored Plaintiff's auditory
hallucinations and mood disorder, continued his medications, and
observed his condition improving.  (See AR 511-16.)  Between
January and April, Plaintiff reported hallucinations "tell[ing]
[him] to spit on people."  (AR 514-16.)  But by June, he reported
that his "medication [was] helping" and that he had residual
hallucinations that occurred "once in a while" or were "on [and]
off [but] not bad."  (See AR 511-13.)

In October 2013, Dr. Villar completed a "Mental Disorder
Questionnaire."  (AR 521-25.)  In it, he observed that Plaintiff
had mental-illness symptoms, including auditory hallucinations
and paranoia, but was "oriented," could "communicate fairly," and
had "fair" memory and "average intelligence."  (AR 521-22.)  He
did not need personal assistance during the interview and was
cooperative.  (Id.)  Though his "concentration [and] task
completion [were] very poor," he "[did] not show any symptoms of
acute psychosis or acute depression" and was found "competent to
manage funds on his[] own behalf."  (AR 522-25.)  Plaintiff also
reported that he helped with household chores, cooked, and took
care of his personal grooming.  (AR 523.)  Dr. Villar's
subsequent visits with Plaintiff indicated he was compliant with
medication and had hallucinations and mood swings less often.
(See AR 528 (Nov. 2013: reporting "happy" with medication, no
hallucinations, and mood swings "sometimes"), 542 (Jan. 2014:

12

reporting residual hallucinations and mood swings "sometimes"),
541 (Mar. 2014: compliant with medication and reporting
"medication help[ing]"), 540 (May 2014: reporting hallucinations
"still there [but] not as bad"); see also AR 539 (June 2014:
compliant with medication and reporting to another doctor that
his hallucinations were intermittent).)

In January and March 2013, Plaintiff's medical records were
reviewed by consulting psychologists Robert Liss and Harvey
Bilik, who found Plaintiff not disabled. (AR 133-34, 137-40,
151-52, 155-58.) Dr. Liss noted, based on the earlier ALJ's
decision, that Plaintiff's credibility regarding his allegations
was "an ongoing problem" that made assessment of his functional
limitations difficult. (AR 134.) He nonetheless found that
Plaintiff's "reported symptoms and observed signs" did not
"suggest any significant worsening of [his] alleged impairments"
since his November 19, 2010 SSI denial. (Id.) Though he found
Plaintiff to have some moderate limitations in "understanding and
memory," "concentration and persistence," "social
interaction[s]," and "adaptation," Plaintiff could "understand
and remember simple and some detailed — but not complex —
instructions," "carry out simple and some detailed — but not
complex — instructions over the course of a normal workweek,"
"interact appropriately with others[] but may benefit from
reduced interactions with the public," and "adapt." (AR 137-39.)
Dr. Bilik reaffirmed those findings. (AR 152, 155-57.) In
particular, he found Plaintiff's hallucinations to be "of limited
credibility," referencing the prior ALJ decision, and gave
"greatest weight" to findings that he had a "60-63" GAF score and

13

was relatively stable.  (AR 149.)

On January 22, 2013, Plaintiff completed an Adult Function Report.  (AR 278-86.)  He reported "hearing voices," not sleeping well, and being "afraid of some people at times," which limited his ability to work.  (AR 278.)  Though he said he did "nothing" all day and did not spend time with others, he also noted that he had no problem with personal care; prepared meals "monthly"; did laundry, ironing, and other "household work"; used public transportation; shopped in stores; paid bills; did not have "any problems getting along with family, friends, neighbors, or others"; and had had no changes in his social activities since his "conditions began."  (AR 279-83.)  He also stated that he got along "fairly well" with "authority figures," such as "police, bosses, landlords or teachers."  (AR 284.)  In a January 2014 Disability Report, Plaintiff stated that his condition had not changed since June 2013 (AR 309) and that he could take care of his "personal needs, but at a slower rate of time" (AR 312).

In August 2014, Plaintiff began seeing Dr. Moffat, who first noted that his medication compliance was "poor" because he had run out of his "meds" for four days.  (AR 538; cf. AR 549 (Nov. 2014 visit with Dr. Moffat indicating "fair" compliance with medication despite being "out of meds for 7 days").)  Plaintiff also had "started drinking . . . to reduce paranoia" (AR 538), but by September 2014 he was "sober" because he "[hadn't] had urges to drink" (AR 537).  Dr. Moffat recommended that Plaintiff attend therapy, but he refused because of a monthlong trip he was taking in October 2014.  (AR 537; see also AR 559 (Plaintiff again declined therapy in December 2014 because he was not

14

"ready").)  In November 2014, Plaintiff, after being "confronted
with lab results," "admit[ted] to issues with medication
compliance" and reported "ongoing hallucinations [and] paranoia."
(AR 558.)  Plaintiff said he was "agitated" because SSI was not
"goin' [his] way."  (Id.)  At that time, Dr. Moffat completed a
Mental Impairment Questionnaire (AR 543-47), in which he noted
that Plaintiff had "severe paranoia," "PTSD-related avoidance
symptoms," "hallucinations," and "severe memory and concentration
deficits" (AR 545).  He assigned Plaintiff a GAF score of 45 and
found him to have moderate, moderate to marked, and marked
limitations in understanding and memory, concentration and
persistence, and social interactions.[8]  (AR 543, 546.)  He also
found that Plaintiff had a St. Louis University Mental Status
Examination ("SLUMS") score of 18 out of 30, which put "his
cognitive ability in the 'Dementia' range."  (AR 545.)  He
concluded that Plaintiff could not work because his "mental
conditions . . . severely limit[ed] his ability to interact with
strangers [and] the public, and to concentrate or remember
details of a routine work schedule."  (AR 547.)

Dr. Moffat's subsequent visits with Plaintiff through the
date of the ALJ's decision, July 2, 2015, showed his condition
improving.  (See, e.g., AR 559-66.)  He noted that Plaintiff had
linear thought processes; he had some or no hallucinations; his
insight and judgment were "good"; he had "good" compliance with

_____

[8] A GAF score of 41 to 50 indicates serious symptoms or any
serious impairment in social, occupational, or school
functioning.  See Diagnostic and Statistical Manual of Mental
Disorders 32 (revised 4th ed. 2000).

medication; and his "mood, psychosis, and anxiety" were stable.
(See, e.g., AR 559 (Dec. 2014), 563 (Feb. 2015), 562 (Apr.
2015).)  Plaintiff also reported enjoying Christmas with his
family and having "a few drinks."  (AR 559.)

The record contains notes from after the ALJ's decision.[9]
In a letter to Plaintiff's counsel dated November 13, 2015, Dr.
Moffat reaffirmed his November 2014 opinion.  (AR 566.)
Referencing the findings in his earlier questionnaire, he stated
that Plaintiff was unable to work because his "paranoia limit[ed]
his ability to interact with [the] public" and he had severe
"cognitive deficits."  (Id.)  He also stated that Plaintiff's
"cognitive function test[ed] in the demented range on the SLUMS
test," again referencing the 2014 questionnaire.  (Id.)

In visits with Dr. Moffat between June and October 2015,
Plaintiff consistently demonstrated linear thought processes,

_____

[9] Social Security Administration regulations "permit
claimants to submit new and material evidence to the Appeals
Council and require the Council to consider that evidence in
determining whether to review the ALJ's decision, so long as the
evidence relates to the period on or before the ALJ's decision."
Brewes v. Comm'r of Soc. Sec. Admin., 682 F.3d 1157, 1162 (9th
Cir. 2012); see also § 416.1470(b).  "[W]hen the Appeals Council
considers new evidence in deciding whether to review a decision
of the ALJ, that evidence becomes part of the administrative
record, which the district court must consider when reviewing the
Commissioner's final decision for substantial evidence."  Brewes,
682 F.3d at 1163; accord Taylor v. Comm'r of Soc. Sec. Admin.,
659 F.3d 1228, 1232 (9th Cir. 2011); see also Borrelli v. Comm'r
of Soc. Sec., 570 F. App'x 651, 652 (9th Cir. 2014) (remand
necessary when "reasonable possibility" exists that "the new
evidence might change the outcome of the administrative
hearing").  The Appeals Council considered "the additional
evidence" provided to it, including a November 2015 letter from
Dr. Moffat and medical records from April 2015 through July 2016,
and found no "basis for changing the [ALJ's] decision."  (AR 2,
4.)

16

"good memory," "good" insight and judgment, and "good" medication
compliance.  (AR 573-74, 576.)  He reported feeling better
because "Seroquel[10] helped [him] sleep," his hallucinations had
"much improved," and his paranoia was "not as bad."  (AR 576.)
In August, however, he reported being "off meds for 2 weeks" and
experiencing "worsening paranoia" and hallucinations.  (AR 574
("He reports he can't function well off his medications.").)  By
October, he reported improvement with hallucinations, paranoia
"at times," and being at "a friend's house," where he suffered a
head injury.  (AR 573.)  He continued to have stress concerning
his ongoing SSI hearings.  (Id.)

In a December 2015 visit with a different doctor at Phoenix
Community Counseling, Plaintiff reported "doing well since his
last appointment" and that "his medications . . . kept him
stable."  (AR 572.)  He stated that he was "look[ing] forward to
spending time with family for Christmas" and was not experiencing
hallucinations or side effects from his medication.  (Id.)  The
doctor observed that Plaintiff had "a good support system with
his father" and that he was "goal directed" and had "logical"
thought forms, a "grossly intact" memory, "[n]o overt psychosis,"
and "good" medication compliance.  (Id.)

In visits with Dr. Moffat during the first half of 2016,
Plaintiff continued to demonstrate linear thought processes,
"good memory," "good" insight and judgment, and "good" medication

---

[10] Seroquel is the name-brand version of quetiapine, an
atypical antipsychotic used to treat the symptoms of
schizophrenia, mania, and depression.  See Quetiapine,
MedlinePlus, https://medlineplus.gov/druginfo/meds/a698019.html
(last updated July 15, 2017).

17

compliance. (AR 567-68, 70.) In March, he reported no hallucinations or delusions. (AR 570.) In May, he reported the same. (AR 568). And in July, he reported the same again and stated that his mood was "good" and "stable despite being off Depakote"[11] and that he had been "talking with an ex-girlfriend for about one year via telephone." (AR 567)

### 3. Analysis

The ALJ gave "little weight" to Dr. Moffat's opinion (AR 30) and provided specific and legitimate reasons for doing so: (1) the opinion was "inconsistent with the findings of attending psychiatrist Romeo Villar" (id.); (2) it "conflict[ed] with progress notes" showing that when Plaintiff was "compliant with following prescribed treatment" and "taking his psychotropic medications," his "symptoms and mood [were] stable," he reported "doing well," he "declined mental health treatment," and he had received GAF scores "rang[ing] between 60 to 65" (id.); (3) the opinion was undermined by his "ability to use public transportation, get along with family members and interact with medical personnel" (AR 29); and (4) the opinion that he was "disabled" or "unable to work" was "not entitled to any special significance" (id.). Because these specific and legitimate reasons were supported by substantial evidence in the record, the ALJ did not err.

---

[11] Depakote is the name-brand version of valproic acid, an anticonvulsant used to treat seizures and mania. See Valproic Acid, MedlinePlus, https://medlineplus.gov/druginfo/meds/a682412.html (last updated July 15, 2017).

a. *Contradicted by other medical-opinion*

*evidence*

Plaintiff argues that the ALJ did not explain how Dr.

Moffat's opinion was inconsistent with Dr. Villar's and thus no

evidence contradicted his opinion. (J. Stip. at 11.)

Accordingly, Dr. Moffat's opinion, Plaintiff contends, should be

given controlling weight. (Id. at 11-12 (citing § 416.927(c)(2);

SSR 96-2p, 1996 WL 374188 (July 2, 1996)).) The ALJ, however,

did not err in this regard, and Dr. Moffat's opinion was properly

discounted based on specific and legitimate reasons. See

Carmickle, 533 F.3d at 1164.

Though Plaintiff correctly highlights that both Dr. Villar

and Dr. Moffat observed that Plaintiff had hallucinations,

paranoia, and "very poor" concentration and task completion (J.

Stip. at 11 (citing AR 521-24; see also AR 545), Dr. Villar's

opinion and treatment records otherwise contradicted Dr.

Moffat's. For example, as the ALJ noted (AR 30), Dr. Villar's

opinion stated that Plaintiff was "oriented" and had "fair"

memory. (AR 522; cf. AR 545 (Dr. Moffat noting "severe" memory

deficits).) He could "communicate fairly," demonstrated "average

intelligence," and was "competent to manage [his own] funds,"

according to Dr. Villar. (AR 522, 525; cf. AR 545 (Dr. Moffat

noting Plaintiff's "cognitive ability in the 'Dementia' range").

Moreover, as highlighted by the ALJ, Dr. Villar found "no

evidence of psychotic symptoms" or "other significant objective

abnormalities." (AR 30; see also AR 523 (on Oct. 22, 2013, Dr.

Villar noting no "symptoms of acute psychosis or acute

depression"; cf. AR 545 (on Nov. 25, 2014, Dr. Moffat noting

"severe paranoia" and "PTSD-related avoidance symptoms")). In further contrast to Dr. Moffat's opinion, Dr. Villar's treatment notes throughout 2013 and 2014 indicated that Plaintiff's condition was not disabling: he was compliant with his medications and experienced less or no hallucinations because the "medication help[ed]." (See, e.g., AR 527-28, 540-41.) Indeed, Plaintiff reported that he was "happy" with his medications (AR 528) and that any hallucinations he experienced were only "mild residual symptoms" (AR 542). Thus, Dr. Moffat's medical opinion was contradicted by Dr. Villar's, and the ALJ was correct in discounting it accordingly.[12] See Thomas, 278 F.3d at 957 (9th Cir. 2002); Batson, 359 F.3d at 1195.

b.  *Inconsistent with medical records*

The ALJ properly found that Dr. Moffat's opinion conflicted with treatment notes throughout the record showing that when Plaintiff was "compliant with . . . medications," "his symptoms and mood [were] stable" and "he [was] doing well." (AR 30.) Dr. Moffat's own treatment notes, for instance, indicated that Plaintiff was stable and that his hallucinations or delusions were controlled with medication. (See, e.g., AR 559, 562, 563, 576.) Throughout 2015 Dr. Moffat noted that Plaintiff was experiencing less or no hallucinations and had been compliant with medication. (See AR 559, 562-63, 576.) Treatment notes through the first half of 2016 showed the same. (See AR 567-68,

---

[12] The differences in the two opinions cannot be explained by their different time frames. Plaintiff stated that his symptoms remained relatively stable (see, e.g., AR 309), and if anything his symptoms improved over time, as he remained compliant with his medicines (see, e.g., AR 511-13, 541, 559).

570.) And, despite Dr. Moffat's conclusion that Plaintiff had severe concentration and memory deficits (AR 545-46), his treatment notes frequently indicated that Plaintiff had good memory and was alert and oriented (see, e.g., AR 576 (June 2015), 574 (Aug. 2015)). Thus, Dr. Moffat's medical opinion was unsupported by the weight of his own treatment notes. See Connett v. Barnhart, 340 F.3d 871, 875 (9th Cir. 2003) (physician's opinion properly rejected when treatment notes "provide[d] no basis for the functional restrictions he opined should be imposed on [plaintiff]"); Rollins v. Massanari, 261 F.3d 853, 856 (9th Cir. 2001) (ALJ permissibly rejected physician's opinion when it was contradicted by or inconsistent with treatment reports); see also Thomas, 278 F.3d at 957 (ALJ need not accept doctor's opinion that "is brief, conclusory, and inadequately supported by clinical findings").

Moreover, Dr. Moffat's opinion that Plaintiff had moderate, moderate to marked, and marked limitations in understanding, memory, concentration, persistence, and social interactions were expressed through an inadequately substantiated check-off report provided by Plaintiff's counsel. (See AR 544-46.) Plaintiff argues that Dr. Moffat appropriately supported his opinion by "identifying numerous mental status abnormalities and psychological testing." (J. Stip. at 7 (citing AR 544-45), 12 (same).) Indeed, he justified Plaintiff's social limitations by attributing them to his "severe paranoia" and "hallucinations" (AR 545), but that explanation was conclusory and failed to indicate any efforts taken by Dr. Moffat to "determine the capacity found therein." De Guzman v. Astrue, 343 F. App'x 201,

21

208-09 (9th Cir. 2009) (ALJ was "free to reject" doctor's
check-off report that did not "indicate any measuring of effort
or give[] a description" of how patient was evaluated (alteration
in original)).  To the extent Dr. Moffat justified Plaintiff's
concentration and memory limitations with his SLUMS score of 18
out of 30, indicating that his cognitive abilities were in the
"dementia" range (AR 545), such a finding was unsupported by
anything in the medical record and "out of proportion to any
findings" even in Dr. Moffat's treatment notes, as discussed
above.  De Guzman, 343 F. App'x at 208-09.  Further still, his
opinion, written in November 2014, was formed only three months
after he began seeing Plaintiff.  See § 416.927(c)(2)(i).  And
Dr. Moffat reiterated the same opinion in November 2015 without
any indication that new psychiatric tests or examinations were
conducted to sustain his findings.  (AR 566); see Thomas, 278
F.3d at 957 (ALJ may discredit opinion that is "inadequately
supported by clinical findings"); Crane v. Shalala, 76 F.3d 251,
253 (9th Cir. 1996) (ALJ permissibly rejected psychological
evaluations "because they were check-off reports that did not
contain any explanation of the bases of their conclusions"); see
also Batson, 359 F.3d at 1195 ("[A]n ALJ may discredit treating
physicians' opinions that are conclusory, brief, and unsupported
by the record as a whole . . . or by objective medical
findings[.]").

Plaintiff also argues that the ALJ relied on treatment
records from before the relevant period.  (J. Stip. at 10 (citing
AR 385, 387, 390, 408).)  Though the ALJ indeed cited to
Plaintiff's prison medical records, which predate his recent SSI

application (see AR 30 (citing AR 385, 387, 390, 408)), he also
relied on records from August, September, and November 2013 and
December 2014 (id. (citing AR 511-12, 528-29, 559)).  Those
records indicated that Plaintiff was doing "well" (AR 511), his
hallucinations occurred "once in a while" and were "not bad" (AR
511-12), he was "happy" with his medications (AR 528), and by
December 2014, he had no hallucinations and even reported
enjoying Christmas and having "a few drinks" with his family
during the holiday (AR 559).  Such findings were reinforced by
other treatment notes during the relevant period showing his
compliance with medication and improved symptoms.  (See, e.g., AR
513 (June 2013), 521-25 (Oct. 2013), 542 (Jan. 2014), 541 (Mar.
2014), 540 (May 2014), 539 (June 2014), 563 (Feb. 2015), 562
(Apr. 2015), 576 (June 2015), 574 (Aug. 2015).)

     Plaintiff also argues that statements that he was "doing
well" and that medication was "helping" him suggested "nothing
about his capacity to withstand the demands of full-time work,"
relying on Ghanim v. Colvin, 763 F.3d 1154, 1164 (9th Cir. 2014),
for the proposition that treatment records demonstrating
improvement "must be viewed in light of the overall diagnostic
record."  (J. Stip. at 10 (citing AR 511, 512, 559).)
Plaintiff's argument is unconvincing.  His reports that he was
"doing well" and that medication was "helping" him were relied on
by the ALJ to assess whether Dr. Moffat's medical opinion was
substantiated by his treatment notes; such reports undermined the
severity of that opinion by showing Plaintiff's improved
condition.  Unlike in Ghanim, the notes were not used to reject
Plaintiff's subjective symptom testimony, see 763 F.3d at 1164,

but were instead used to discount a treating physician's medical opinion. Substantial evidence therefore supports the ALJ's adverse assessment of Dr. Moffat's opinion based on its inconsistency with the record as a whole. See Rollins, 261 F.3d at 856.[13]

            c.   *Inconsistent with activities of daily living*

The ALJ properly found that Dr. Moffat's opinion regarding Plaintiff's "discomfort around others" was undermined by "his ability to use public transportation, get along with family members and interact with medical personnel." (AR 29.) It was also undermined by Plaintiff's reported trip in October 2014. (AR 30.) Plaintiff argues that the ALJ "failed to identify

_____

[13] The ALJ also discounted Dr. Moffat's opinion because the GAF score he assessed for Plaintiff of 45 (AR 543) was inconsistent with records showing GAF scores of 60 to 65 (see AR 30 (citing AR 391, 394, 410, 418, 424-24)). Indeed, during the months just before his release from incarceration in September 2012 and the filing of his SSI application in November of that year, Plaintiff was assigned GAF scores of 63 (AR 411 (July 9)), 65 (AR 410 (Aug. 2), 409 (Aug. 27)), and 55 (AR 408 (Sept. 14)). Though the ALJ relied on scores from just before the relevant period, Dr. Moffat's low GAF finding was inadequately supported and inconsistent with the record as a whole, as discussed above and below, and thus any error was harmless. See Parker v. Comm'r of Soc. Sec., No. 2:16-CV-0087-SMJ, 2017 WL 4158617, at *7 (E.D. Wash. Sept. 19, 2017) (ALJ's rejection of low GAF scores was supported by substantial evidence showing that "Plaintiff was able to complete her activities of daily living with few limitations"); Smith v. Colvin, No. C14-1530 TSZ, 2016 WL 8710029, at *6 (W.D. Wash. Oct. 14, 2016) (upholding ALJ's conclusion that medical opinion's "unjustifiably low" GAF score was not supported by record); see also Thomas, 278 F.3d at 957; Batson, 359 F.3d at 1195. Indeed, "a GAF score is merely a rough estimate of an individual's psychological, social, or occupational functioning used to reflect an individual's need for treatment, but it does not have any direct correlative work-related or functional limitations." Hughes v. Colvin, 599 F. App'x 765, 766 (9th Cir. 2015) (citing Vargas v. Lambert, 159 F.3d 1161, 1164 n.2 (9th Cir. 1998) (as amended)).

substantial evidence" to support this finding.  (J. Stip. at 8.)
He argues that "[t]here is absolutely no evidence that he use[d]
public transportation on a regular basis or [had] meaningful
interactions with others, nor does the record reflect that
Plaintiff actually went somewhere for a month or what this trip
consisted of."  (Id. at 9.)  Substantial evidence, however,
supports the ALJ's determination.

Plaintiff's January 2013 function report indicated that he
used public transportation; had no problem with personal care;
prepared meals "monthly"; did laundry, ironing, and other
"household work"; shopped in stores; and paid bills.  (AR 279-
81.)  His Disability Report indicated that he could take care of
his "personal needs" (AR 312), and he similarly reported to Dr.
Villar that he managed his own funds, helped with household
chores, cooked, and took care of his personal grooming (AR 523,
525).  Regarding his ability to be around others, he reported not
having "any problems getting along with family, friends,
neighbors, or others" (AR 283) and got along "fairly well" with
"authority figures," like "police, bosses, landlords, [and]
teachers" (AR 284); his social activities had not changed since
his "conditions began" (AR 283).  In December 2014, Christmas
with his family "brought [him] a little joy" and he had "a few
drinks" with them.  (AR 559.)  In December of the following year,
he was "look[ing] forward to spending time with [them again] for
Christmas."  (AR 572.)  During visits with Dr. Moffat, Plaintiff
reported that he was going on a monthlong trip in October 2014
(AR 537), had been at "a friend's house" around October 2015 (AR
573), and in July 2016 had been "talking with an ex-girlfriend

for about one year via telephone" (AR 567).

His medical records further demonstrated that he interacted appropriately with medical personnel, who consistently noted that he "appear[ed] well" and "in no acute distress," was "alert and oriented," and "verbalized understanding and agreement with [his treatment] plan[s]" (see, e.g., AR 472, 476-77, 480-82, 484), further demonstrating that his ability to be around others was greater than Dr. Moffat opined. To the extent Plaintiff's hearing testimony suggested otherwise (see AR 50-51 (noting that he got around on bicycle and was not close to his father or siblings)), the ALJ properly found his subjective symptom testimony not entirely credible (AR 28), as discussed below.[14] Thus, substantial evidence supports the ALJ's use of Plaintiff's activities of daily living to discount Dr. Moffat's medical opinion that he could not work around others. See Coaty v. Colvin, 673 F. App'x 787, 787-88 (9th Cir. 2017) (affirming ALJ's adverse determination of treating physician's medical opinion because it was "speculative and inconsistent" with activities of daily living), cert. denied sub nom. Coaty v. Berryhill, 137 S. Ct. 2309 (2017); Lunn v. Astrue, 300 F. App'x 524, 525 (9th Cir. 2008) (affirming ALJ's rejection of treating physician's medical opinion that was "contrary to [plaintiff's] reports of her daily activities").

In any event, the ALJ accommodated Plaintiff's alleged

---

[14] Plaintiff stated in his function report that his father encouraged him by telling him he was "do[ing] a good job" (AR 280), and a Phoenix Community Counseling doctor noted that Plaintiff's dad provided him with "a good support system" (AR 572).

preference for limited contact with others by finding that he
could not work with the public or engage in any "teamwork,"
should work in a "quiet environment," and could communicate with
others only in certain specific, limited circumstances.  (AR 28.)
Thus, even if the ALJ erred in her adverse assessment of Dr.
Moffat's opinion on this basis, the error was likely harmless.
See Hughes v. Colvin, 599 F. App'x 765, 766 (9th Cir. 2015)
(holding potential medical-opinion error harmless when ALJ's RFC
took into account plaintiff's "moderate difficulties in social
functioning" by restricting her to "job[s] where she could work
independently with no more than occasional public interaction").

> d.   *Opinion on disability*

Finally, the ALJ correctly afforded no "special
significance" to Dr. Moffat's conclusion that Plaintiff was
"disabled" or "unable to work."  (See AR 29.)  While Plaintiff
argues that the opinions of treating physicians are generally
given greater weight (J. Stip. at 6-7 (citing Garrison v. Colvin,
759 F.3d 995, 1012 (9th Cir. 2014)), the ALJ was not obligated to
accept a medical-source statement regarding Plaintiff's ultimate
disability status.  See § 416.927(d)(1) ("A statement by a
medical source that you are 'disabled' or 'unable to work' does
not mean that we will determine that you are disabled."); SSR 96-
5p, 1996 WL 374183, at *5 (July 2, 1996) (treating-source
opinions that a person is disabled or unable to work "can never
be entitled to controlling weight or given special
significance"); see also McLeod v. Astrue, 640 F.3d 881, 885 (9th
Cir. 2011) (as amended) ("A disability is an administrative
determination of how an impairment, in relation to education,

age, technological, economic, and social factors, affects ability to engage in gainful activity."). Dr. Moffat's opinion was therefore appropriately discounted on this ground.

Accordingly, the ALJ did not err in assessing the medical-opinion evidence or, as discussed below, Plaintiff's credibility. Properly rejected medical evidence and subjective complaints do not need to be incorporated into a plaintiff's RFC. See Bayliss, 427 F.3d at 1217. Substantial evidence therefore supports the ALJ's RFC determination. As such, remand is not warranted on this basis. See Saelee, 94 F.3d at 522.

B.    The ALJ Properly Assessed the Credibility of
      Plaintiff's Subjective Symptom Statements

The ALJ found that Plaintiff's statements "concerning the intensity, persistence and limiting effects" of his mental symptoms were "not entirely credible."[15] (AR 28-29.) Plaintiff argues that this finding was improper because it was not supported by substantial evidence. (See J. Stip. at 20.) The ALJ, however, based her credibility assessment on clear and convincing reasons. Accordingly, remand is not warranted on this ground.

1.    Applicable law

An ALJ's assessment of the credibility of a claimant's allegations concerning the severity of his symptoms is entitled to "great weight." See Weetman v. Sullivan, 877 F.2d 20, 22 (9th Cir. 1989) (as amended); Nyman v. Heckler, 779 F.2d 528, 531 (9th Cir. 1985) (as amended Feb. 24, 1986). "[T]he ALJ is not

---

[15] Plaintiff challenges only the ALJ's credibility determination regarding his mental impairments. (J. Stip at 19.)

'required to believe every allegation of disabling pain, or else disability benefits would be available for the asking, a result plainly contrary to 42 U.S.C. § 423(d)(5)(A).'" <u>Molina v. Astrue</u>, 674 F.3d 1104, 1112 (9th Cir. 2012) (quoting <u>Fair v. Bowen</u>, 885 F.2d 597, 603 (9th Cir. 1989)).

In evaluating a claimant's subjective symptom testimony, the ALJ engages in a two-step analysis. <u>See Lingenfelter</u>, 504 F.3d at 1035-36; <u>see also</u> SSR 96-7p, 1996 WL 374186 (July 2, 1996).[16] "First, the ALJ must determine whether the claimant has presented objective medical evidence of an underlying impairment [that] could reasonably be expected to produce the pain or other symptoms alleged." <u>Lingenfelter</u>, 504 F.3d at 1036. If such objective medical evidence exists, the ALJ may not reject a claimant's testimony "simply because there is no showing that the impairment can reasonably produce the <u>degree</u> of symptom alleged." <u>Smolen</u>, 80 F.3d at 1282 (emphasis in original).

If the claimant meets the first test, the ALJ may discredit the claimant's subjective symptom testimony only if she makes specific findings that support the conclusion. <u>See Berry v. Astrue</u>, 622 F.3d 1228, 1234 (9th Cir. 2010). Absent a finding or affirmative evidence of malingering, the ALJ must provide "clear and convincing" reasons for rejecting the claimant's testimony. <u>Brown-Hunter v. Colvin</u>, 806 F.3d 487, 493 (9th Cir. 2015) (as amended); <u>Treichler v. Comm'r of Soc. Sec. Admin.</u>, 775 F.3d 1090,

---

[16] Social Security Ruling 16-3p, 2016 WL 1119029, effective March 28, 2016, rescinded SSR 96-7p, which provided the framework for assessing the credibility of a claimant's statements. SSR 16-3p was not in effect at the time of the ALJ's decision in this case, however.

1102 (9th Cir. 2014).  The ALJ may consider, among other factors,

(1) ordinary techniques of credibility evaluation, such as the

claimant's reputation for lying, prior inconsistent statements,

and other testimony by the claimant that appears less than

candid; (2) unexplained or inadequately explained failure to seek

treatment or to follow a prescribed course of treatment; (3) the

claimant's daily activities; (4) the claimant's work record; and

(5) testimony from physicians and third parties.  Rounds v.

Comm'r Soc. Sec. Admin., 807 F.3d 996, 1006 (9th Cir. 2015) (as

amended); Thomas, 278 F.3d at 958-59.  If the ALJ's credibility

finding is supported by substantial evidence in the record, the

reviewing court "may not engage in second-guessing."  Thomas, 278

F.3d at 959.

## 2.  Additional relevant background

At his February 10, 2015 hearing, Plaintiff testified that

his paranoia kept him from working (AR 49) and that he had

problems concentrating (AR 56).  He stated that because of his

"past experience with being incarcerated," he was afraid of

people, and being around them was "the most significant problem

for [him]."  (AR 49-50.)  He also stated that he "hear[s] voices"

that "tell [him] about spitting on people, pissing people,

hitting on people, cursing people out, [and] doing all kinds of

bad things."  (AR 53-54.)  He testified to taking medication (AR

45-46) that was helping him (AR 53).  He still heard voices

"sometimes" when on medication, but "[m]ost of the time, [he

didn't] hear them because [he took his] medication as prescribed

at the same time that [he was] supposed to take [it]."  (Id.)  He

testified that he did not "need help remembering to take [his]

30

medication." (AR 58.) He also stated that he lived with his
father (AR 49), that they "seldomly talk[ed]" because of his
"paranoia of people" (AR 51), that they went to doctor's
appointments and did grocery shopping together, and that he did
not have any difficulty while "doing those things with him" (AR
54).

### 3. Analysis

Plaintiff argues that the ALJ's credibility determination is
not supported by substantial evidence. (J. Stip. at 20.) As
discussed below, the substantial weight of the evidence, looking
at the record as a whole, undermines Plaintiff's statements
regarding his mental functional limitations, and the ALJ
therefore did not err.

First, the ALJ properly found Plaintiff's symptom statements
not entirely credible because they were unsupported by "clinical
signs and findings" or "the objective medical evidence." (AR
29.) Plaintiff alleges that he was unable to work because his
mental impairments severely limited his ability to concentrate
and be around other people. (J. Stip. at 19.) At his hearing,
he similarly testified that being around people was the most
significant difficulty for him and that he had problems
concentrating. (AR 50, 56.) He reported that "hearing voices,"
not sleeping well, and being "afraid of some people at times"
limited his ability to work. (AR 278.) These statements,
however, were inconsistent with his medical records and the other
evidence.

As discussed by the ALJ, Plaintiff's treatment notes
indicated that his "medications were relatively effective in

controlling [his] symptoms" during the applicable period.[17] (AR
29; see also, e.g., AR 511-13, 528, 540-42, 559, 562-63, 574,
576.) Throughout 2013 and 2014, Dr. Villar's notes indicated
that Plaintiff's condition was improving: he experienced
hallucinations less often, reported improvement with his mood
swings, and frequently stated that his medication was helping.
(See AR 511-16, 527-28, 540-41.) Dr. Moffat's notes throughout
2015 and into 2016 similarly indicated that Plaintiff's condition
was improving and stable and that he was compliant with
medication. (See AR 559-68, 570, 573-74, 576.) As discussed
above, to the extent Dr. Moffat opined that Plaintiff's
hallucinations and paranoia were debilitating, the ALJ properly
discounted his medical opinion and relied on the findings
substantiated by his treatment notes. Though some notes indicate
that Plaintiff reported still hearing voices while on medication
(see, e.g., AR 540), he also reported not hearing voices while on
medication (see, e.g., AR 567) and testified that he did not hear
voices when he took his medication as prescribed (AR 53).
Plaintiff's treatment records therefore show substantial
inconsistency between his allegations and his apparently
improving condition, undermining his subjective symptom

---

[17] The ALJ may have erred in finding Plaintiff's course of
treatment "conservative." (AR 29.) But even if the ALJ was
wrong, see, e.g., Childress v. Colvin, No. EDCV 14-0009-MAN, 2015
WL 2380872, at *14 (C.D. Cal. May 18, 2015) (finding treatment of
prescription antidepressants, prescription antipsychotics, and
talk therapy not properly characterized as conservative), she did
not err in concluding that it was largely effective. Moreover,
as discussed above and below, the ALJ gave other legally
sufficient reasons for partially discounting Plaintiff's
credibility.

statements.  See Womeldorf v. Berryhill, 685 F. App'x 620, 621
(9th Cir. 2017) ("[The ALJ] properly discounted [Plaintiff's]
severity claims by pointing to . . . the nature of the medical
evidence itself."); Carmickle, 533 F.3d at 1161 ("Contradiction
with the medical record is a sufficient basis for rejecting the
claimant's subjective testimony."); see also Burch v. Barnhart,
400 F.3d 676, 681 (9th Cir. 2005) ("Although lack of medical
evidence cannot form the sole basis for discounting pain
testimony, it is a factor that the ALJ can consider in his
credibility analysis.").

     Moreover, the record indicates that Plaintiff refused
therapy (see, e.g., 537, 559) and contains no indication that he
ever attended therapy or was psychiatrically hospitalized.  And
yet Plaintiff was clearly aware that he had mental-health issues
and sought treatment for them.  His refusal to engage in one
course of treatment while undergoing others therefore undermined
his allegations of his symptoms' severity, as the ALJ found (AR
30), and distinguishes Plaintiff's situation from that in Nguyen
v. Chater, 100 F.3d 1462, 1464-65 (9th Cir. 1996) (claimant's
failure to seek any psychiatric treatment for over three years
not legitimate basis for discounting medical opinion that he had
severe depressive disorder).  Cf. Judge v. Astrue, No. CV
09-4743-PJW, 2010 WL 3245813, at *4 (C.D. Cal. Aug. 16, 2010)
("[The claimant's] failure to get treatment after 1997 seems more
a function of the fact that she did not need it, as opposed to
her inability to comprehend that she needed it.").

     Second, the ALJ properly found that Plaintiff's "allegations
of significant limitations [were] not borne out in his

33

description of his daily activities." (AR 29.) An ALJ may properly discount the credibility of a plaintiff's subjective symptom statements when they are inconsistent with his daily activities. See Molina, 674 F.3d at 1112 (ALJ may discredit claimant's testimony when "claimant engages in daily activities inconsistent with the alleged symptoms" (citing Lingenfelter, 504 F.3d at 1040)). "Even where those [daily] activities suggest some difficulty functioning, they may be grounds for discrediting the claimant's testimony to the extent that they contradict claims of a totally debilitating impairment." Id. at 1113.

The ALJ noted that Plaintiff was "able to independently manage his transportation," "[got] around with public transportation," "[did] his own laundry," "help[ed] with the household chores and cook[ed]." (AR 29.) Although Plaintiff claimed to do "nothing" from the moment he got up to the time he went to bed (AR 279), he also reported that he had no problem with personal care; prepared meals "monthly"; did laundry, ironing, and other "household work"; and paid bills. (AR 279-83.) He similarly reported to Dr. Villar that he helped with household chores, cooked, and took care of his personal grooming (AR 523), and in his Disability Report, he stated that he could take care of his "personal needs" (AR 312). Regarding his social interactions, Plaintiff reported that he used public transportation; shopped in stores; did not have "any problems getting along with family, friends, neighbors, or others"; got along "fairly well" with "authority figures," such as "police, bosses, landlords, or teachers"; and had experienced no changes in his social activities since his "conditions began." (AR 279-

84.)  He also reported enjoying Christmas and spending time with

his family (AR 559), looking forward to spending the next

Christmas with his family (AR 572), being at a "friend's house"

(AR 573), and "talking with an ex-girlfriend" for a year (AR

567).  Moreover, his medical records demonstrated that he

interacted appropriately with medical personnel, who consistently

noted that he "appear[ed] well" and "in no acute distress," was

"alert and oriented," and "verbalized understanding and agreement

with [his treatment] plan[s]" (see, e.g., AR 472, 476-77, 480-82,

484).  Thus, substantial evidence of Plaintiff's activities of

daily living, which demonstrated his functional ability and

capacity to engage effectively with others, supports the ALJ's

adverse credibility determination.  See Womeldorf, 685 F. App'x

at 621 (upholding ALJ's discounting of plaintiff's credibility in

part because his activities of daily living "were not entirely

consistent with his claimed inability to engage in social

interactions").

     For all these reasons, the ALJ's adverse credibility

determination is supported by substantial evidence looking at the

record as a whole.  Plaintiff is therefore not entitled to remand

on this ground.

     C.   The ALJ Properly Relied on the VE's Testimony

     Plaintiff argues that "[t]he ALJ failed to present a

hypothetical to the VE that accurately described all of [his]

mental limitations found in the decision." (J. Stip. at 24.)  In

particular, the ALJ failed to capture his "moderate difficulties

in concentration, persistence, or pace." (Id.)  For the reasons

discussed below, however, the ALJ did not err.

1                 1.   <u>Applicable law</u>

At step five of the five-step process, the Commissioner has the burden to demonstrate that the claimant can perform some work that exists in "significant numbers" in the national or regional economy, taking into account the claimant's RFC, age, education, and work experience. <u>Tackett v. Apfel</u>, 180 F.3d 1094, 1100 (9th Cir. 1999); <u>see</u> 42 U.S.C. § 423(d)(2)(A); 20 C.F.R. § 416.960(c). To ascertain the requirements of occupations as generally performed in the national economy, the ALJ may rely on VE testimony or information from the DOT. SSR 00-4P, 2000 WL 1898704, at *2 (Dec. 4, 2000) (at steps four and five, SSA relies "primarily on the DOT (including its companion publication, the SCO) for information about the requirements of work in the national economy" and "may also use VEs . . . at these steps to resolve complex vocational issues"); SSR 82–61, 1982 WL 31387, at *2 (Jan. 1, 1982) ("The [DOT] descriptions can be relied upon — for jobs that are listed in the DOT — to define the job as it is <u>usually</u> performed in the national economy." (emphasis in original)). When a hypothetical includes all the claimant's credible functional limitations, an ALJ is generally entitled to rely upon the VE's response to it. <u>Thomas</u>, 278 F.3d at 956; <u>see also</u> <u>Bayliss</u>, 427 F.3d at 1218 ("A VE's recognized expertise provides the necessary foundation for his or her testimony.").

                 2.   <u>Relevant background</u>

The ALJ presented to the VE a hypothetical person who was 57 years old and had a ninth-grade education, no past relevant work, and the following limitations:

[He] would have the following limits specifically non-

36

public, non-complex, routine tasks. Work can be done in
the proximity of others, but no tasks that would require
teamwork. . . . No work that — where this hypothetical
person would be responsible for the health or safety of
others or would require hypervigilance. Verbal
instructions, no written instructions, and no
concentrated exposure to respiratory irritants. Work in
a quiet environment. No required communication with
others unless this person could look directly at them and
minimal to no background noise.

(AR 61-62.) The VE testified that such a person would be able to
perform the jobs of hospital cleaner, DOT 323.687-010, 1991 WL
672782, dining-room attendant, DOT 311-677-018, 1991 WL 672696,
and hand packager, DOT 920.587-018, 1991 WL 687916. (AR 62.) At
the supplemental hearing on June 2, 2015, the VE found the hand-
packager job no longer applicable but added that the hypothetical
person would be able to perform the job of floor waxer, DOT
381.687-034, 1991 WL 673262. (AR 98-99.)

The ALJ presented a second hypothetical, adding to the first
the limitation that "if [the hypothetical] person were distracted
and unable to concentrate or focus [he] would require constant
reminders, even at a very unskilled level of work, and those
reminders were daily in nature or every day and continuing
through the day." (AR 62.) The VE testified that such an
individual would be precluded from the jobs listed in response to
the first hypothetical and all other jobs. (Id.)

In determining whether Plaintiff had an impairment or
combination of impairments that met or equaled any of the

37

Listings, the ALJ found that under the "paragraph B" criteria of § 416.920a(e)(2), used to evaluate the severity of mental impairments at steps two and three of the sequential evaluation process, Plaintiff had "moderate difficulties in maintaining concentration, persistence, or pace." (AR 27.)  The ALJ explicitly stated, however, that "[t]he limitations identified in the 'paragraph B' . . . criteria are not a [RFC] assessment." (Id.)

3. <u>Analysis</u>

Plaintiff's RFC included a full range of work at all exertional levels but with nonexertional limitations:

> nonpublic; noncomplex routine tasks; can work in proximity to others but no tasks that require teamwork[;] cannot perform detailed tasks[;] cannot perform work where he would be responsible for the health and safety of others or require hypervigilance; should have verbal instructions rather than written instructions; should work in a quiet environment; cannot be required to communicate with others unless he can look directly at them with minimal to no background noise; should not be exposed to concentrated respiratory irritants.

(AR 28.)

The ALJ properly consulted the VE to determine whether any available jobs would accommodate Plaintiff's specific limitations.  <u>See</u> SSR 83-12, 1983 WL 31253, at *2 (Jan. 1, 1983) (noting that when individual's exertional RFC does not coincide with any of defined ranges of work but instead includes "considerably greater restriction(s)," VE testimony can clarify

38

extent of erosion of occupational base); <u>Moore v. Apfel</u>, 216 F.3d
864, 870 (9th Cir. 2000); <u>Thomas</u>, 278 F.3d at 960.  Plaintiff
argues that the hypothetical posed by the ALJ failed to account
for the "moderate difficulties in concentration, persistence, or
pace" that "[t]he ALJ found" Plaintiff to have.  (J. Stip. at 24
(citing AR 27).)  Plaintiff relies on <u>Brink v. Commissioner</u>
<u>Social Security Administration</u>, 343 F. App'x 211, 212 (9th Cir.
2009), which held that an "ALJ's initial hypothetical question to
[a] vocational expert" was in error because it "referenced only
'simple, repetitive work,' without including limitations on
concentration, persistence or pace."  (<u>See</u> J. Stip. at 24); <u>see</u>
<u>also</u> <u>Lubin v. Comm'r of Soc. Sec. Admin.</u>, 507 F. App'x 709, 712
(9th Cir. 2013) (holding that ALJ erred because limiting claimant
to "one to three step tasks" didn't capture "moderate
difficulties in maintaining concentration, persistence, or pace,"
which "should have [been] included" in hypothetical question to
VE).

In <u>Brink</u>, an ALJ accepted medical evidence that a claimant
had "moderate difficulty maintaining concentration, persistence,
or pace" but failed to include such limitations in his
hypothetical question to the VE, which referenced only "simple,
repetitive work."  343 F. App'x at 212.  The ALJ in <u>Lubin</u>
similarly erred by not including his finding of "moderate
difficulties in maintaining concentration, persistence, or pace"
in his RFC assessment or hypothetical to the VE because his
limitation to "one to three step tasks" was insufficient.  507 F.
App'x at 712.  Those cases, however, do not implicate the rule
that an ALJ's RFC assessment should be based only on limitations

supported by the record.  See Bayliss, 427 F.3d at 1217; Batson,
359 F.3d at 1197; see also Stubbs-Danielson v. Astrue, 539 F.3d
1169, 1174 (9th Cir. 2008) ("[A]n ALJ's [RFC] assessment of a
claimant adequately captures restrictions related to
concentration, persistence, or pace where the assessment is
consistent with restrictions identified in the medical
testimony.").  As discussed in detail above, the ALJ did not err
in assessing Plaintiff's RFC.  As the ALJ found, and unlike in
Brink and Lubin, the medical evidence here did not establish that
Plaintiff suffered from moderate mental limitations, and the ALJ
properly discounted Plaintiff's allegations of more restrictive
limitations in concentration and pace because they were
unsupported by the medical record.  Because the ALJ was not
required to include in the RFC limitations that were permissibly
discounted, she did not err in her hypothetical to the VE.  See
Batson, 359 F.3d at 1197 (ALJ not required to incorporate into
RFC those findings from treating-physician opinions that were
"permissibly discounted"); see also Yelovich v. Colvin, 532 F.
App'x 700, 702 (9th Cir. 2013) ("Because the RFC was not
defective, the hypothetical question posed to the VE was
proper.").

      To the extent Plaintiff contends that the ALJ's step-three
finding of some moderate mental limitations should have been
incorporated into the hypothetical question to the VE (J. Stip.
at 24), the argument is unavailing.  Some "unpublished district
court opinions[, in following Brink and Lubin, have found] error
when the ALJ finds that a claimant has moderate limitation in
maintaining concentration, persistence, or pace at step two [or

                                  40

three], but attempts to account for this in the RFC only by limiting the claimant to simple, repetitive work." Jahnsen v. Berryhill, __ F. Supp. 3d __, No. 1:16-cv-0019-HRH, 2017 WL 3018068, at *5 (D. Alaska July 13, 2017) (second alteration in original) (citations omitted). But a step-three finding that a claimant has "moderate difficulties in maintaining concentration, persistence, or pace" need not be included in an ALJ's RFC assessment or hypothetical question to a VE when such limitations are unsupported by substantial evidence. See Wilder v. Comm'r of Soc. Sec. Admin., 545 F. App'x 638, 639 (9th Cir. 2013) (citing Stubbs-Danielson, 539 F.3d at 1174). Indeed, "limitations identified in step 3 . . . are 'not an RFC assessment but are used to rate the severity of mental impairment(s) at steps 2 and 3.'" Israel v. Astrue, 494 F. App'x 794, 796 (9th Cir. 2012) (emphasis in original) (quoting SSR 96-8p, 1996 WL 374184, at *4 (July 2, 1996)); see also Hoopai v. Astrue, 499 F.3d 1071, 1076 (9th Cir. 2007) ("The step two and step five determinations require different levels of severity of limitations such that the satisfaction of the requirements at step two does not automatically lead to the conclusion that the claimant has satisfied the requirements at step five."). Thus, moderate limitations in concentration, persistence, or pace found at steps two and three do "not automatically translate to a RFC finding with these limitations." Williams v. Colvin, No. CV 16-2433 JC, 2016 WL 7480245, at *7 (C.D. Cal. Dec. 29, 2016) (citing Phillips v. Colvin, 61 F. Supp. 3d 925, 940 (N.D. Cal. 2014)).

Accordingly, the ALJ here did not err. She specifically noted that the step-three limitations in concentration,

persistence, and pace "[were] not a [RFC] assessment" and "[t]he mental [RFC] . . . used at steps 4 and 5 of the sequential evaluation process require[d] a more detailed assessment." (AR 27.)  She accounted for Plaintiff's mental limitations to the extent that they were supported by the medical record, assessing him with limitations that included "noncomplex," "routine," and "[non-]detailed tasks." (AR 28.)  Such limitations were consistent with treatment notes documenting Plaintiff's "average intelligence" (AR 522), "good" memory (see, e.g., AR 568, 570, 573-74, 576), "good" insight and judgment (see, e.g., id.), and medicinally controlled condition (see, e.g., AR 528, 540-41, 559, 562-63, 567-68, 570, 572, 576).  See Stubbs-Danielson, 539 F.3d at 1174; Sabin v. Astrue, 337 F. App'x 617, 621 (9th Cir. 2009) ("The RFC finding is consistent with these reports and adequately captures the tasks [claimant] can do despite her concentration, persistence, or pace restrictions.")  And as discussed above, the record did not substantiate greater, let alone moderate, limitations.

Thus, the RFC was supported by substantial evidence and adequately captured Plaintiff's mental limitations, and "the ALJ committed no reversible error in failing to specifically include [P]laintiff's deficiencies in [concentration, persistence, or pace] in either her RFC assessment . . . or her subsequent hypothetical to the [VE]."  See Maidlow v. Astrue, No. EDCV 10-01970-MAN, 2011 WL 5295059, at *5 (C.D. Cal. Nov. 2, 2011); see also Rhodus v. Berryhill, No. CV-16-00238-TUC-LCK, 2017 WL 4150445, at *4-5 (D. Ariz. Sept. 19, 2017) (upholding RFC assessment that was "consistent with the [medical record],

42

regardless of the paragraph B functional assessment"); Duncan v. Astrue, No. C12-546-MJP-JPD, 2012 WL 5877510, at *5-6 (W.D. Wash. Nov. 1, 2012) (upholding RFC assessment and VE hypothetical that limited claimant to "simple and some complex instructions" despite step-three finding that he had "mild to moderate" limitations in concentration, persistence, and pace), accepted by 2012 WL 5877495 (W.D. Wash. Nov. 19, 2012).

Thus, substantial evidence supports the ALJ's finding that Plaintiff could perform the jobs identified by the VE. The ALJ was entitled to rely on the VE's informed, specific, and uncontradicted explanation that consistent with his RFC, Plaintiff was able to work as a dining-room attendant, hospital cleaner, and floor waxer. See Bayliss, 427 F.3d at 1218. Accordingly, remand is not warranted on this basis.

**VI. CONCLUSION**

Consistent with the foregoing and under sentence four of 42 U.S.C. § 405(g),[18] IT IS ORDERED that judgment be entered AFFIRMING the Commissioner's decision, DENYING Plaintiff's request for remand, and DISMISSING this action with prejudice.

DATED: October 24, 2017

_____
JEAN ROSENBLUTH
U.S. Magistrate Judge

---

[18] That sentence provides: "The [district] court shall have power to enter, upon the pleadings and transcript of the record, a judgment affirming, modifying, or reversing the decision of the Commissioner of Social Security, with or without remanding the cause for a rehearing."